**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | No. 16 CR 436-2, -3 |
| | ) | |
| **RONNIE R. MITCHELL and** | ) | **Judge Rebecca R. Pallmeyer** |
| **SAMMY R. GORDON,** | ) | |
| | ) | |
| **Defendants.** | ) | |

<u>**MEMORANDUM ORDER**</u>

Defendants Ronnie R. Mitchell and Sammy R. Gordon were arrested on July 7, 2016, after police officers discovered a half kilogram of heroin in a paper shopping bag inside Mitchell's vehicle. Mitchell and Gordon have been charged with knowingly possessing a controlled substance with the intent to distribute, in violation of 21 U.S.C. § 841(a)(1). The Defendants moved to suppress the evidence obtained during the search of Mitchell's vehicle, all evidence derived from that search, and all statements they made to the police. (Gordon's Motion to Suppress [44]; Mitchell's Motion to Suppress [45]) (adopting the arguments advanced in Gordon's Motion). Defendants contend the police lacked any legal justification to conduct a warrantless search during an investigatory stop of the vehicle. The court conducted an evidentiary hearing on April 3 and June 26, 2017, and, after reviewing additional briefing, initially denied Defendants' Motions to Suppress. (*See* Order Denying Motions to Suppress [74]; Transcript of Proceedings held on 9/21/17 [83] ("9/21/17 Hearing Tr."), 2:19–23.) On November 15, 2017, Defendants moved for reconsideration. (Gordon's Motion to Reconsider [85]; Mitchell's Motion to Reconsider [87].)[1]

---

[1]    *See also* Motion to Amend Defendant Gordon's Previously Filed Motion to Reconsider and Reverse the Previous Denial of Defendant's Motion to Suppress [91] ("Gordon's Supp. Motion to Reconsider") *and* Motion to Reconsider Court's Ruling Denying Defendant's

For the reasons explained here, the court concludes that the search was lawful only if Mitchell consented to it, and that the evidence offered to date is insufficient to establish that he did. The court therefore grants the Defendants' renewed motions to suppress [85, 87, 91, 92] with respect to the quantity of heroin discovered during the July 7 search.

## FACTUAL BACKGROUND

Gordon and Mitchell's arrest stemmed from a DEA investigation into heroin distribution in the Chicago area. (Government's Response to Defendants' Motions to Suppress Evidence [49] ("Gov't Resp. Br."), 1.) Based on information obtained from an unnamed cooperating defendant ("the CD"), the DEA began investigating co-defendant Jaime Valdez-Jacobo in June 2016. (*Id.*) Before the day of their arrest, Gordon and Mitchell were not known to the surveilling officers. (*Id.* at 2.) Valdez-Jacobo, the initial subject of the investigation, was not with Gordon and Mitchell at the time of the search, but was also charged. Valdez-Jacobo has pleaded guilty and is not a party to this motion to suppress.

The sequence of events leading up to the *Terry* stop and search of Mitchell's vehicle are not disputed. On the morning of July 7, 2016, law enforcement began surveilling two residences—the "LaSalle Street" and "Calhoun Street" Residences—in Aurora, Illinois, which the CD had identified as associated with Valdez-Jacobo. (*Id.*) The surveillance team assigned to monitor Valdez-Jacobo's activities consisted of between six to eight vehicles manned by DEA agents and local police officers from several Illinois towns. (*See* Gordon's Motion to Suppress 3.) Although the CD had previously told the DEA that he had purchased several kilograms of heroin from Valdez-Jacobo at the Calhoun Street Residence, the DEA did not have any information to suggest that a drug transaction was set for on any particular day. (*Id.* at 2–3.)

---

Motion to Suppress of Ronnie R. Mitchell and Motion to Adopt Factual and Legal Arguments Contained in Gordon's Motion to Reconsider [92] ("Mitchell's Supp. Motion to Reconsider").

Beginning around 9:00 AM, agents followed Valdez-Jacobo as he drove around in a white Chevy pickup truck. The agents observed Valdez-Jacobo visit the two residences, run errands, and perform roofing work at a job site for several hours. (*Id.*) Later in the day, between 3:00 and 4:00 PM, the surveillance team followed Valdez-Jacobo as he drove to a strip mall in Schaumburg, Illinois, parked his truck, and waited there for roughly thirty minutes. (*Id.* at 3–4.) At 4:27, a grey Ford F150 truck and a gold Volvo SUV—driven by Gordon and Mitchell, respectively—entered the parking lot and approached Valdez-Jacobo's truck. (*Id.* at 4.) All three vehicles then left the parking lot together, with Valdez-Jacobo leading Gordon and Mitchell half a mile down Salem Drive to an apartment complex in Hoffman Estates, Illinois. Valdez-Jacobo parked in the apartment building's parking lot, while Gordon and Mitchell parked their vehicles in the parking lot of an office complex across the street. (*Id.*)

Once in the office complex's parking lot, under law enforcement observation, Gordon exited his Ford truck carrying a large, white paper shopping bag and walked over to Mitchell's Volvo SUV. (*Id.*) The surveilling officers could not see into the shopping bag, nor could they tell whether the bag contained anything. (*Id.*; *see also* Transcript of Evidentiary Hearing held on 4/3/17 [57] ("4/3/17 Ev. Hearing Tr."), 41:17–42:4; Transcript of Evidentiary Hearing held on 6/26/17 [63] ("6/26/17 Ev. Hearing Tr.") 24:4–16, 62:23–65:16.) Gordon entered Mitchell's SUV with the bag, and Mitchell drove the two of them across the street to the apartment complex where Valdez-Jacobo was waiting. (Gov't Resp. Br. 3.) All three men then exited their vehicles, talked briefly, and entered the apartment complex together. (*Id.*) The surveillance team did not enter the apartment building, and did not see where the men went once inside.

Ten minutes later, at approximately 4:40 PM, Mitchell and Gordon left the apartment building without Valdez-Jacobo. (Gordon's Motion to Suppress 5.) Gordon was still carrying the shopping bag, and the officers were still unable to determine what, if anything, the bag contained. (*Id.*; *see also* 4/3/17 Ev. Hearing Tr. 45:1–23; 6/27/17 Ev. Hearing Tr. 26:1–20.) Mitchell and Gordon returned to Mitchell's Volvo SUV and drove back across the street to the

parking lot where Gordon had left his truck. (Gordon's Motion to Suppress 6.) At this point, suspecting that a drug transaction had just taken place inside the apartment complex, one of the surveillance team's leaders, DEA Special Agent Jason Fisher, ordered agents to approach the vehicle and conduct an investigatory stop. (*See* 6/26/17 Ev. Hearing Tr. 15:4–11.) Three to four police cars activated their sirens and entered the parking lot, blocking off the Defendants' exit. (4/3/17 Ev. Hearing Tr. 88:2–24; 6/27/17 Ev. Hearing Tr. 44:12–17.) DEA Special Agent David Piña and Buffalo Grove Police Officer Brian Parker were the first to approach Mitchell's vehicle, with Piña on the driver's side and Parker confronting Gordon on the passenger side. (4/3/17 Ev. Hearing Tr. 89:18–21.)

The parties' agreement on the course of events ends here. Both officers have testified that they "walked" up to the Defendants—who were either in the process of exiting the vehicle or already outside—identified themselves, patted the Defendants down, and asked for identification. (4/3/17 Ev. Hearing Tr. 87:7–88:18; 6/27/17 Ev. Hearing Tr. 44:18–23; *see also* Gov't Resp. Br. 4.) Piña described Mitchell as being "very compliant" during the encounter, and stated that he moved Mitchell "towards the back of the vehicle so we would not be in the scene." (6/27/17 Ev. Hearing Tr. 44:22–45:22.) Parker described Gordon, too, as "cooperative and polite" and testified that he moved Gordon away from Mitchell's Volvo towards Parker's own vehicle. (4/3/17 Ev. Hearing Tr. 90:2–21.) Defendant Ronnie Mitchell, however, testified that his initial encounter with the task force officers was not nearly so congenial. Mitchell claimed that both he and Gordon were still inside his Volvo when the officers pulled in behind him. (6/27/17 Ev. Hearing Tr. 75:1–76:13.) According to Mitchell, the officers ran up with their guns drawn and pulled him and Gordon out of the vehicle at gunpoint. (*Id.*) Both he and Gordon were handcuffed almost immediately and separately led away towards the officers' cars. (*Id.* at 77:14–78:6.) Agent Piña corroborated at least part of Mitchell's account on cross-examination and admitted that he had "probably" drawn his gun, although he could not speak for the other

officers at the scene.[2]  (*Id.* at 59:2–14.)  Neither Piña nor Parker, however, could remember whether they placed Mitchell and Gordon in handcuffs right away or after their fellow officers had searched Mitchell's vehicle.  (*Id.* at 45:23–46:7; 4/3/17 Ev. Hearing Tr. 90:22–91:19.)

Michael Bedalow, a police officer from Justice, Illinois, who was assigned to the task force, conducted the search.  Bedalow arrived on the scene just after Piña and Parker, and testified that Piña informed him that Mitchell had consented to having his vehicle searched. (4/3/17 Ev. Hearing Tr. 21:18–24.)  Bedalow nevertheless explained his purpose as unrelated to consent; he characterized it as a safety sweep for weapons and other persons: "I approached the vehicle from the passenger side, and I just wanted to make sure that nobody else was in the vehicle.  So I opened the passenger side door to make sure nobody else was sitting in the backseat." (*Id.* at 22:4–15.)  During cross-examination, Bedalow admitted that both Mitchell and Gordon were both by then up to 25 feet away from the car—possibly handcuffed—and that none of the other surveilling officers had mentioned that another person might be in the car.  (*Id.* at 62:24–63:17.)  Nevertheless, Bedalow reiterated that "My reason for opening th[e] door was to secure the vehicle, to make sure nobody else was in there and there were no accessible weapons."[3]  (*Id.* at 49:21–23, 51:15–52:11, 62:6–23.)

Once in the car, Bedalow saw the white shopping bag resting on the floor behind the front passenger seat.  (4/3/17 Ev. Hearing Tr. 22:18–19.)  Bedalow claimed that the top of the bag was open, and that he was able to look down into the bag and see a brick-shaped object wrapped in black electrical tape and clear plastic wrap.  (*Id.* at 22:19–25.)  Other officers took the following pictures at the scene:

---

[2]      For his part, Officer Michael Bedalow, another task force officer, testified that he never saw any guns drawn during the stop.  (4/3/17 Ev. Hearing Tr. 61:4–12.)

[3]      Officer Parker corroborated Bedalow's explanation on cross-examination and testified that Bedalow told him that he entered the car to conduct a safety sweep.  (4/3/17 Ev. Hearing Tr. 132:21–135:14.)



(Ex. 1 to Gordon's Motion to Reconsider [85-1]; Government's Ex. 4 at 6/27/17 Ev. Hearing.)
Based on his experience, and given the context of the investigation into Valdez-Jacobo's
activities, Bedalow concluded that this object likely contained heroin. (4/3/17 Ev. Hearing Tr.
23:2–17.) Bedalow called out to his fellow officers that the vehicle was "positive for narcotics."
(*Id.* at 23:22; *see also id.* at 92:13–15, 6/26/17 Ev. Hearing Tr. 45:24–46:3.) Later on, other
unknown officers removed the bag from the vehicle and discovered that the wrapped package
contained 577 grams of a white powdery substance. (Affidavit of Special Agent Eric Collins in
Support of the Amended Criminal Complaint [1] ("Collins Aff."), ¶ 20.) A field test confirmed that
substance to be heroin. (*Id.*)

In support of the criminal complaint initiating this case, DEA Special Agent Erik Collins
submitted an affidavit in which he justified the search of Mitchell's vehicle on two independent
grounds. Collins, like Agent Fisher, was a leader of the surveillance team but was not present
for the stop. He prepared the relevant sections of his affidavit from contemporaneous notes he
took during his conversations with the other officers. (*Id.* at ¶ 5; Transcript of Preliminary
Hearing held on 7/27/16 [43] ("7/27/16 Prelim. Hearing Tr."), 48:6–9.) First, Collins asserted
that the officers observed the shopping bag on the floorboard of the vehicle by looking through
the rear passenger side window as they approached. (Collins Aff. ¶ 19.) Though the affidavit
makes no mention of the condition of the windows, undisputed evidence shows that the rear
passenger window of Mitchell's SUV was both rolled up at the time and tinted. (*See*

Government's Ex. 2 at 6/27/17 Ev. Hearing.) Collins's affidavit nevertheless asserts that officers were able to look through the tinted window, down into the open top of the shopping bag, and spot the wrapped object resting at the bottom. (Collins Aff. ¶ 19.) The Government repeated this explanation several times up until the time of the evidentiary hearing. (*See, e.g.,* 7/27/16 Prelim. Hearing Tr. 23:20–21, 40:20–41:4; Gov't Resp. Br. 3–4.) At the hearing, however, all of the testifying officers denied having spotted the shopping bag or brick of heroin through the window, and none could explain how Agent Collins came to believe that course of events.[4] (*See* 4/3/17 Ev. Hearing Tr. 62:10–18, 70:7–18, 119:6–124:15.) The Government has since effectively withdrawn any argument that the search was justified by the officers' "plain view" of the heroin through the vehicle's window.

The Government now justifies the search only on the second ground stated in Collins's affidavit: that Mitchell consented. (*See* Collins Aff. ¶ 20.) Agent Piña testified that he asked Mitchell for consent to search Mitchell's Volvo, and that Mitchell responded "yes." (6/26/17 Ev. Hearing Tr. 44:24–45:22.) Piña was not wearing a body camera or other recording device, nor did he have Mitchell sign a consent form at the scene. (*Id.* at 59:18–60:6.) None of the other officers heard this conversation. After purportedly receiving consent from Mitchell, Piña claims that "I told my other law enforcement partners that were there, I said, hey, we have consent." (*Id.* at 45:19–20.) Although Officer Parker was nearby dealing with Gordon, he testified that he did not hear Piña or anyone else announce that Mitchell had consented to a search, and only became aware of the search after it had occurred. (4/3/17 Ev. Hearing Tr. 91:3–15.) Officer Bedalow also did not hear Mitchell say anything during his interaction with Piña. As noted, however, Bedalow testified that as he approached the scene after Piña and Parker's initial contact with the Defendants, Piña "related to [Bedalow] that we had consent to search the vehicle." (*Id.* at 21:1–22, 49:11–20.)

---

[4]       Agent Collins did not testify at the evidentiary hearing, but did testify under oath at the preliminary hearing before Magistrate Judge Gilbert on July 27, 2016.

Mitchell firmly denies that he ever gave the officers permission to search his vehicle—or even that the officers asked him for it. (6/26/17 Ev. Hearing Tr. 76:22–78:14, 85:20–25.) He also claims that Piña never declared "we have consent" to the other officers present, nor said this to Bedalow directly, as Bedalow testified. (*Id.* at 86:8–10.) Rather, Mitchell states, Bedalow and the fourth officer at the scene, DEA Special Agent Mike Cierniak, simply entered Mitchell's Volvo and began a search after Piña had forcibly removed and handcuffed him. (*Id.* at 77:4–25, 80:14–84:8.)

During Mitchell's cross-examination at the evidentiary hearing, the prosecutor asked Mitchell whether he objected to officers' search once he saw that it was underway. (*Id.* at 84:9–10.) Mitchell responded evasively to these questions:

> Q. When you saw this officer go into your car, did you object to the search of the car?
>
> A. What can I tell the agents?
>
> Q. That's not my question. I am asking, did you object to the search of the car?
>
> A. I'm in handcuffs. What can I say?
>
> THE COURT: Is that a "no"? You did not object?
>
> THE WITNESS: I did not object to anything, because I wasn't there close enough to tell him . . . to not search the car.

(*Id.* at 84:18–85:4.) The Government emphasized Mitchell's lack of an objection during its closing argument and in its supporting briefs. (*See id.* at 93:17–19; Government's Post Hearing Briefing Regarding Defendants' Motions to Suppress Evidence [67] ("Gov't Post-Hearing Br."), 5, 8–10.)

To bolster their contention that Mitchell did in fact consent to the search, several task force officers asserted that Mitchell signed a consent form at some point after his arrest. At the preliminary hearing before Magistrate Judge Gilbert, Agent Collins stated that Mitchell provided written consent to search his vehicle. (7/27/16 Prelim. Hearing Tr. 41:19–23.) Collins's affidavit, however, stated only that Mitchell consented in writing to a search of his *cell phone.*

(Collins Aff. ¶ 25.) Agent Piña also stated that Mitchell had given written consent to search his Volvo, but, when asked to identify the document during the evidentiary hearing, Piña instead presented defense counsel with a consent form signed by *Gordon* regarding Gordon's Ford truck. (6/26/17 Ev. Hearing Tr. 52:9–53:8.) Piña recognized his mistake, but nevertheless insisted that Mitchell, too, had signed a consent form and that Piña remembered initialing that document. (*Id.* at 53:10–54:1.) Piña believes such a form must be with the rest of the case file. (*Id.*) So far, however, the Government has not produced a form reflecting consent for a search of Mitchell's vehicle, and the testimony of Agent Fisher regarding the case file and inventory of evidence suggests that no such document exists. (*Id.* at 28:24–31:4.)

Finally, the parties have disputed the appearance and condition of the paper shopping bag itself—namely, whether the wrapped package of heroin was actually in plain view at the bottom of the bag during Officer Bedalow's search. It is undisputed that the officers did not ask Gordon (or Mitchell) for consent to search the bag itself. The first photograph above shows that the shopping bag was pinched in the middle: at the very least, partly obscuring any view of its contents. The second photograph shows the contents of the bag. The parties agree that the second photograph was taken after Bedalow looked inside the bag and discovered the heroin. (*See* 6/26/17 Ev. Hearing Tr. 103:24–104:19.) Taking this second photograph also necessarily involved moving and manipulating the shopping bag in order to get a camera inside—as evidenced by the large rips visible in the bottom of the bag. (*Id.* at 33:7–34:2, 103:24–104:19.) The parties disagree, however, as to when the first photograph was taken.

Defendants claim that the first photograph accurately depicts the outside of the shopping bag as it appeared at the time of the search. (*See* 6/26/17 Ev. Hearing Tr. 103:15–104:19, 111:21–112:3.) In their view, the photograph shows that the shopping bag was a "closed container" and that it would have been impossible for Bedalow to have seen anything at the bottom without opening the bag first. (*Id.*) The officers involved, however, all testified that the photograph was also taken by other, unknown officers at some time after Bedalow discovered

the heroin.  (*See* 4/3/17 Ev. Hearing Tr. 28:18–29:1, 70:7–25.)  Bedalow testified that this first photograph showed the shopping bag in the proper position in Mitchell's Volvo—on the floorboard behind the front passenger seat—but claimed that the "the bag was fully opened" and not pinched together when he first saw it.  (*Id.* at 28:2–10.)  As a result, he claims he was indeed able to view the wrapped heroin at the bottom without touching the shopping bag.  (*Id.* at 51:1–53:7, 63:20–65:4.)  Bedalow does not know what happened to the bag after he first saw it, and could only speculate as to how the top of the bag ended up pinched together in the photograph.  (*Id.* at 50:18–52:24.)  Defendants counter by asserting that standard police procedure would be to take photographs of evidence before touching it, and that therefore Bedalow must have seen the bag as it appeared in the photograph.  (6/26/17 Ev. Hearing Tr. 103:15–104:3.)  They also point out that "no trained Federal agent would find a bag with half a kilo of heroin in the open and in plain view, then close the bag for the picture showing the probable cause to search, arrest, and prosecute."  (Mitchell's Supp. Motion to Reconsider 2–4.)  In any event, the Government and its witnesses urge that even if the shopping bag was pinched in the middle, as shown in the photograph, it would not have prevented anyone from easily spotting the wrapped package at the bottom.  (Gov't Post-Hearing Br. 9–10; *see also* 6/26/17 Ev. Hearing Tr. 32:21–25) (Agent Fisher responding to defense counsel's suggestion that the photograph depicted a "closed white bag" with: "You say 'closed.'  The corners are open, but yes.  I mean, it's not wide open, but I wouldn't call that closed either.")

## PROCEDURAL BACKGROUND

At the close of the evidentiary hearing, this court did not initially focus on the issue of consent.  Instead, the court asked for briefing on three final questions: (1) whether the surveillance team had a reasonable suspicion of illegal activity to justify the investigatory stop, (2) whether the bag as shown in the photograph constituted a "closed container," and (3) assuming the shopping bag was a closed container, whether Mitchell's alleged consent to search his vehicle would extend to the shopping bag.  (*See* 6/26/17 Ev. Hearing Tr. 114:4–

119:14.)  The parties briefed the issues and the court made its ruling on the original suppression motions on September 21, 2017.  Although the court stated that the officers' conduct here was not "a perfect model of police work," it denied the Defendants' motions to suppress.  (9/21/17 Hearing Tr. 2:19–23, 9:22.)

Based on the officers' testimony, the court concluded that reasonable suspicion existed to justify the stop under *Terry v. Ohio*, 392 U.S. 1 (1968).  The surveillance team had been working from information provided by the CD, and the unusual driving pattern and car-switching that Valdez-Jacobo, Mitchell, and Gordon engaged in represented sufficiently articulable facts of illegal activity.  (9/21/17 Hearing Tr. 2:24–5:22; *see also* Gov't Post-Hearing Br. 6) (citing *United States v. Wilbourn*, 799 F.3d 900, 909 (7th Cir. 2015)).  The court stated that these facts may not be "hugely suspicious," but the circumstances nevertheless "give rise to reasonable suspicion that what went on in the apartment was some kind of [narcotics] transaction that somehow involved the three men."  (9/21/17 Hearing Tr. 5:3–7.)

The court then orally addressed the issue of consent, referring to Agent Piña's testimony on that issue.  (*Id.* at 6:2–8.)  The court also discussed Mitchell's opposing testimony in detail:

> Mr. Mitchell denies that he gave consent, but his testimony suggested to me that what he meant was, ["]I didn't feel I had any choice.["]  I got the sense that Mr. Mitchell meant that he didn't voluntarily say, "Yes, you can search my car."  And that could be.  The reality is not whether or not Mr. Mitchell felt pressure or felt that he didn't have any choice, but whether or not the agents in fact got consent to search the car, and I think that I'm satisfied that they did.

(*Id.* at 6:9–16.)

As for the shopping bag, the court concluded that the heroin likely was in plain view at the bottom.  At the evidentiary hearing, the court reviewed the photographs and stated:

> It's true that in the photograph the bag is open on either side and more or less closed in the middle.  Does that make it a closed container?  I mean, it looks to me like that's just an open bag, sitting in somebody's backseat between, I think, the passenger side and the backseat.  I don't know that I would call that a closed container.

(6/26/17 Ev. Hearing Tr. 115:23–116:5.)  The Defendants' arguments on this issue did not sway the court.  Although, in principle, a paper bag can be considered a "closed container," *see, e.g., California v. Acevedo*, 500 U.S. 565, 573 (1991), the facts here showed that the top of the shopping bag was not closed, rolled up, or otherwise fastened together.  (*See* Gov't Post-Hearing Br. 9.)  The court confused the matter somewhat by speculating about whether and when the bag was moved from the vehicle and how that might have impacted its appearance in the photograph (*see* 9/21/17 Hearing Tr. 9:10), but even viewing the evidence in the light most generous to the Defendants the shopping bag was never *fully* closed.  Overall, the court found Officer Bedalow's testimony credible as to what he saw in back seat of Mitchell's Volvo, his ability to identify the wrapped package as some form of controlled substance, and the fact that he did not move or otherwise touch the shopping bag.  (*Id.* at 8:5–15.)  The angle from which the photograph was taken did not provide a view of the bottom of the bag, but it appeared that an officer otherwise legally present in the vehicle could have seen the object inside it without completely opening the bag first.  (*Id.* at 8:16–9:15.)  Regardless of whether the bag was fully open or partly open, Bedalow would have been able to see the brick of heroin "without great difficulty."  (*Id.* at 10:10–13.)

Although the court denied the Defendants' suppression motions, the court noted serious concerns about the Government's version of events.  First, Agent Collins' second-hand account of the officers' observing a brick of heroin in plain view through the windows of Mitchell's vehicle was false.  (*Id.* at 6:22–7:3.)  The officers testifying at the evidentiary hearing abandoned any such explanation, and the circumstances suggested that it would be nearly impossible to see the brick in those conditions.  The windows of Mitchell's Volvo were rolled up and tinted, the height of the vehicle would have made it difficult to see down to the floorboards, and the brick was located at the bottom of an at least semi-closed bag.  (*Id.* at 7:4–10.)

Second, it was not clear that Officer Bedalow would have found it necessary to conduct a protective sweep of Mitchell's vehicle.  As the court noted,

12

> [Bedalow] testified that he could not see inside the car and, in fact, had to open the door. He testified he thought there might be somebody else there. I don't find that terribly plausible. As was drawn out on cross-examination, [the surveillance team] had been observing these vehicles. They didn't see anybody else get in or out. I don't believe that they genuinely were concerned that somebody else could have been in the car, although it's possible given that the windows were tinted.
>
> He also suggested that he was looking for weapons. A weapon in plain view seems to be an unlikely event. But if that were the case, he might want to have looked for it, in spite of the fact that, as we know, Mr. Gordon and Mr. Mitchell were at that point outside the car at least a few yards distant from it. So they couldn't have reached for any weapon that might have been in there.

(*Id.* at 7:15–8:4.) Despite these deficiencies, the court found Mitchell's consent sufficient to independently justify the search.

The court concluded its analysis by stating that the Government's evidence was "pretty slim," and that denying the suppression motions was a very close call. (*Id.* at 10:10–14, 12:16–19.) The court effectively invited motions for reconsideration, which Defendants filed on November 15, 2017. (*See* Gordon's Motion to Reconsider.) Gordon's motion essentially repeats the arguments advanced in his post-hearing brief and focuses on the case law holding that an individual's consent to search his or her vehicle does not automatically extend to the closed containers within that vehicle. (*See id.* at 2–3) (citing *United States v. Infante-Ruiz,* 13 F.3d 498, 505 (1st Cir. 1994) and *People v. James*, 163 Ill. 2d 302, 313–19, 645 N.E.2d 195, 201–03 (1994)). Mitchell, who adopts Gordon's motion, also continues to insist that he never consented, that the shopping bag was closed, and that the officers' account of the stop "is a total fabrication." (Mitchell's Motion to Reconsider 3–4; Mitchell's Supp. Motion to Reconsider 1–3.) Finally, the Defendants highlight portions of the hearing transcript in which this court purportedly erred by speculating that the shopping bag had been removed from the vehicle prior to being photographed. (*See* Gordon's Supp. Motion to Reconsider 1–4.) The Government opposes the Defendants' motions on the basis that they "merely reiterate arguments that [they] made both during oral argument and in [their] previous filings" and fail to demonstrate that the court made any legal or factual errors in denying the suppression motions. (Government's

Response to Defendants' Motions to Reconsider [88] ("Gov't Resp. to Defs.' Motions to Reconsider"), 3–4.)

**DISCUSSION**

The Fourth Amendment prohibits "unreasonable searches and seizures." As the Seventh Circuit has stated, "[a]lthough a warrant is often required to make a search reasonable, certain warrantless searches are also reasonable, including those conducted with the suspect's consent." *United States v. $304,980.00 in U.S. Currency*, 732 F.3d 812, 819 (7th Cir. 2013). Consent may be express or implied, verbal or nonverbal, but it must be voluntarily given. *See United States v. Sabo*, 724 F.3d 891, 893 (7th Cir. 2013) (holding that a homeowner consented to a search of his mobile home when he stepped back and to the side to admit the officers after they requested to enter). Voluntariness "is a question of fact to be determined from the totality of the circumstances." *Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973). Consent given during an illegal detention is invalid unless the state proves that it "resulted from an independent act of free will." *United States v. Pedroza*, 269 F.3d 821, 827 (7th Cir. 2001) (quoting *United States v. Thompson*, 106 F.3d 794, 798 (7th Cir. 1997)).

Even without consent, officers may conduct warrantless searches pursuant to several well-established exceptions. Under the "automobile exception," law enforcement may conduct a warrantless search of a vehicle when they have probable cause to believe that it contains contraband or evidence of a crime. *United States v. Paige*, 870 F.3d 693, 702 (7th Cir. 2017) (citing *Carroll v. United States*, 267 U.S. 132, 153–56 (1925)). In addition, officers may conduct protective searches of vehicles during *Terry* stops if they have "a reasonable suspicion that the motorist may be armed and may be able to gain immediate control of weapons." *United States v. Arnold*, 388 F.3d 237, 239 (7th Cir. 2004) (citing *Michigan v. Long*, 463 U.S. 1032, 1049 (1983)). Such protective sweeps are typically limited to the accessible areas of the passenger compartment, and include only "those areas in which a weapon may be placed or hidden." *Id.* at 239–40 (explaining that the acceptable search area includes trunks or cargo spaces that are

"generally . . . within reach" of the passenger compartment). Finally, officers who have legally accessed a place may seize any evidence they spot "in plain view," provided that its incriminating character is immediately apparent to them. *United States v. Contreras*, 820 F.3d 255, 262 (7th Cir. 2016) (citing *Horton v. California*, 496 U.S. 128, 136 (1990)).

In their original motions to suppress, the Defendants challenged numerous elements of the seizure and subsequent search, including whether the officers had reasonable suspicion to conduct a *Terry* stop of individuals previously unknown to them, and whether the Government could introduce certain post-arrest statements made by the Defendants. Although Defendant Mitchell questions all of the court's earlier factual determinations, the only issue raised in Gordon's motion to reconsider is whether the officers were authorized to search the shopping bag itself. Gordon insists that the bag as shown in the images above constituted a "closed container" and, as a result, the officers would have needed probable cause (which the Government has never argued existed), a search warrant (which the officers did not have), or consent to search *the bag itself*. (Gordon's Motion to Reconsider 3–4.) Consent to search the bag, Defendants claim, could have only come from Gordon because the officers would have known from their extensive surveillance that Gordon had sole control over the bag. (*Id.* at 2–3; *see also* Mitchell's Supp. Motion to Reconsider 1–3) (adopting Gordon's arguments).

Defendants highlight a portion of the court's oral ruling that, the court agrees, reflects an error in its analysis. Describing the photographs taken of the shopping bag, the court stated:

> I'm satisfied that the photograph was not taken before the agent [i.e. Bedalow] looked inside it. I'm satisfied that he looked inside first, and only after he saw the narcotics, concluded there was probable cause, the formal arrests of the defendants took place.

> At that point . . . somebody needed to make this photograph, and they put that bag back in, and the took a photograph of the bag behind the front seat at some point.

(9/21/17 Hearing Tr. 9:2–10.) Defendants correctly point out that none of the agents testified that they or anyone else removed the bag from the vehicle before the photograph was taken.

(Gordon's Supp. Motion to Reconsider 2–3.)  They insist that the bag therefore must have been in its pictured state—pinched in the middle—at the time of Bedalow's search and that he could not have seen the brick of heroin in plain view.  (*Id.* at 4–5.)

Although there is an ongoing dispute over when the photographs were taken and exactly how the shopping bag appeared, the court is not persuaded by the Defendants' argument. Even viewing the evidence in the light most generous to the Defendants, the court concludes that the shopping bag was *at least* open in the corners at the time the officers first observed it. The bag was not folded, zippered, or fastened shut, and the photograph shows large holes remaining at either end of the opening.  As a result, the brick of heroin would still have been plainly visible at the bottom of the bag.[5]  In some sense, the parties' disagreement over the bag is largely a matter of perspective: to the Defendants "half closed"; to the government "half open" (if not more).  The important point is simply that the bag was not *entirely* closed.  Consistent with its findings at the evidentiary hearing, this court is satisfied that the partial opening at the top of the bag provided a large enough window for an officer to be able observe its contents.  (*See* 6/26/17 Ev. Hearing Tr. 115:23–116:5) ("[I]t looks to me like that's just an open bag, sitting in somebody's backseat[.]  I don't know that I would call that a closed container.").  Given his training, the circumstances, and the appearance of the object at the bottom, the court is also satisfied that Officer Bedalow could reasonably conclude that the object at the bottom contained a controlled substance.

Having concluded that the brick of heroin was in plain view within the vehicle, the court turns to the core argument in Defendant Mitchell's motion for reconsideration: whether he consented to the vehicle search in the first place.  (*See* Mitchell's Motion to Reconsider 2–6;

---

[5]        Furthermore, although the officers did not know if or when the bag had been moved, testimony at the evidentiary hearing established that the bag was almost certainly moved before other officers took the second photograph of the inside of the shopping bag.  (*See* 6/26/17 Ev. Hearing Tr. 33:7–34:2, 103:24–104:19.)  When issuing its decision, the court inferred that it must have been moved and returned to the vehicle before the first photograph as well.  However, whether the bag was entirely open (as claimed by the Government) or *slightly* closed (as claimed by Defendants) makes no difference in the court's analysis.

Mitchell's Supp. Motion to Reconsider 2.) This court originally stated that Mitchell consented to the search and described its skepticism of Mitchell's testimony in these terms:

> With respect to consent, I have a hard time finding Mr. Mitchell's testimony all that plausible. Here is why: [the AUSA] gave him three opportunities to answer the question. It was a "yes" or "no" question, and he didn't want to do it. It wasn't until I cut in and said, "Okay, I'm taking that as a 'no'" that he gave an unequivocal "no."
>
> There was no reason for him, when she asked the question, "Did you give consent?" for him not to simply say "no."
>
> Instead he answered with the rhetorical "well, what was I supposed to do under the circumstances?" or something like that. I just didn't find that all that plausible.

(6/26/17 Ev. Hearing Tr. 116:15–117:1.) The court later summarized its findings as "suggest[ing] . . . that what he meant was, I didn't feel I had any choice" given the situation, but that Mitchell did in fact consent. (9/21/17 Hearing Tr. 6:9–16.)

In reviewing the record, however, the court recognizes that it misstated Mitchell's testimony on the question of consent when it originally ruled on the Defendants' suppression motions. The Government never asked Mitchell on cross-examination whether he consented to the search; it asked whether Mitchell *objected* to the search after it had already begun. (*See* 6/26/17 Ev. Hearing Tr. 84:18–85:4.) Mitchell had already testified that Agent Piña never asked him for permission to search his vehicle, and only responded evasively to the Government's line of questioning about why he failed to stop a search he claimed he did not authorize. Mitchell's evasive responses—"I'm in handcuffs. What can I say?"—are much more understandable in light of their actual context. (*Id.*)

A defendant's failure to object is one factor to consider when evaluating the existence or scope of consent and is often relevant in situations where officers arguably exceed the permission granted them. *See, e.g., United States v. Stribling*, 94 F.3d 321, 324 (7th Cir. 1996) (stating that it was the defendant's duty to limit the scope of her consent to search); *United States v. Evans*, 27 F.3d 1219, 1231 (7th Cir. 1994) (considering the defendant's lack of objection when he claimed that he intended his consent to search to be narrower than the scope

on his signed consent form). Failure to object by itself does not constitute consent, however, particularly where, as here, the Defendant claims that the officers never asked him for permission before conducting the search. *See Padilla v. City of Chicago*, 932 F. Supp. 2d 907, 925 (N.D. Ill. 2013) ("The Government may not show consent to enter from the defendant's failure to object to the entry. To do so would be to justify entry by consent and consent by entry. This will not do.") (quoting *United States v. Shaibu*, 920 F.2d 1423, 1427 (9th Cir. 1990)). "Instead something more—even if it is nonverbal—must be present to show the occupant has consented[.]" *Id.* (citing *United States v. Villegas*, 388 F.3d 317, 324–25 (7th Cir. 2004) and *United States v. Cotnam*, 88 F.3d 487, 495 (7th Cir.1996)).

Absent this critical piece of evidence, the court is unable to conclude that Mitchell voluntarily consented to a search of his vehicle. *See United States v. McGraw*, 571 F.3d 624, 628 (7th Cir. 2009). There is no video or audio footage of the stop, and, despite the arresting officers' claims, there is no proof that Mitchell ever authorized the search in writing. As a result, the Government must rely solely on the testimony of the arresting officers. Agent Piña testified that he asked for and received consent from Mitchell, but the language Piña used to describe the conversation was robotic and conclusory. (*See, e.g.,* 6/26/17 Ev. Hearing Tr. 44:24–45:1) ("I asked him for consent in the vehicle. He said I have consent. At that point I let the other agents that were with me that we have consent.") The court does not expect witnesses to remember the exact words used in a year-old conversation, but Agent Piña's inability to explain the interaction in plain language (and his insistence, despite the absence of evidence, that a written consent exists) is disappointing. Additionally, Piña's testimony suggested that he did not have any direct conversations with another officer regarding Mitchell's consent, but rather that he declared, perhaps even yelled, that fact to the other officers. (*Id.* at 44:20–45:1, 45:19–20) ("I told my other law enforcement partners that were there, I said, hey we have consent.") Yet none of the officers testified to hearing any such declaration—including Officer Parker, who,

despite standing a short distance away from the vehicle, notably remembered hearing someone else proclaim "it's positive" after the heroin had been found. (4/3/17 Ev. Hearing Tr. 91:3–15.)

Officer Bedalow's testimony presented similar concerns. Bedalow stated that Piña personally told him—not declared—that Mitchell had given consent. (*Id.* at 21:1–22, 49:11–20.) But Bedalow's subsequent testimony largely focused on justifying his entry into Mitchell's vehicle as a *protective sweep*. (*Id.* at 22:4–15, 49:21–23, 51:15–52:11, 62:6–23.) This story does not add up. Bedalow had just claimed that he had been given permission to search the entire vehicle. Given consent, he would not have needed to limit his conduct to a protective sweep in order to access the passenger compartment. Nor would a protective sweep have been necessary in this situation: it is undisputed that Mitchell and Gordon had already been frisked and led roughly 25 feet away from the vehicle by the time of the search.

The parties' disagreement over the remaining details of the stop does not shore up the justification for the search. The officers testified that the stop was congenial, and the Defendants claimed that they were pulled out of the vehicle at gunpoint and handcuffed. Either way, the officers could not have reasonably believed that the two men could access any weapons from the passenger compartment. (*See* 9/21/17 Hearing Tr. 7:23–8:4.) Nor could Bedalow have reasonably believed that any other unknown persons were lying in wait in the back seat. The court recognized as much during the evidentiary hearing when it questioned Bedalow's account of the stop: "they were observing these vehicles. They didn't see anyone else get in or out. I don't believe that they genuinely were concerned that somebody else could have been in the car[.]" (*Id.* at 7:14–21) Overall, Bedalow's insistence on characterizing his search as a protective sweep casts doubt on the Government's claim that Mitchell consented.

As litigation of this issue has progressed, the Government's rationale for the search has shifted. Agent Collins' affidavit in support of the criminal complaint advanced the now-unsupported claim that the officers first spotted the brick of heroin in plain view, at the bottom of the shopping bag, through the tinted windows of Mitchell's vehicle. (*See id.* at 7:2–12)

(criticizing Agent Collins' claims as one of several "troubling aspects" of the Government's story). Agent Collins repeated this claim under oath at the preliminary hearing. None of the officers present at the scene, however, testified that they could see anything through the windows, and the Government dropped this argument at the evidentiary hearing before this court. Next, several of the officers have claimed that Mitchell signed a form consenting to the search of his vehicle at some point. (*See* 7/27/16 Prelim. Hearing Tr. 41:19–23; 6/26/17 Ev. Hearing Tr. 52:9–54:1.) The Government, however, has been unable to produce this form or establish any record of its existence. Officer Bedalow's final effort to frame the search as a protective sweep further supports the court's conclusion that the search is not supported by consent.

On a further review of the record, Defendant Mitchell's account of the stop as a rapid show of force is at least as credible as the officers' version. The officers uniformly described it as a casual, calm event; most denied that they had their guns drawn. (*But see* 6/26/17 Ev. Hearing Tr. 59:9–14) (Agent Piña testifying that he "probably" had his gun out). Mitchell disputes their claims. Because the court concludes that the Government did not prove that Mitchell gave consent, it makes no finding on this issue, or whether it affects Mitchell's ability to voluntarily consent to the search.[6] The court notes, however, that if Mitchell's story is accurate, the level of force used approaches the boundaries of acceptable conduct during a *Terry* stop. The Seventh Circuit has stated that "the hallmarks of formal arrest such as applying handcuffs, drawing weapons, and placing suspects in police vehicles should not be the norm during an

---

[6] Even Defendants' account of the events would not necessarily defeat a finding of voluntary consent. *Compare Contreras*, 820 F.3d at 270 ("In short, a show of force is not inherently coercive") (collecting cases) *with United States v. Talkington*, 843 F.2d 1041, 1048–49 (7th Cir. 1988) (holding a defendant's consent involuntary when the officers broke into his house in the middle of the night with their weapons drawn, lied about obtaining a search warrant, and threatened to conduct a cavity search of the defendant's wife unless he let them search his home). The fact that an individual is in custody, while probative, also does not preclude a finding that his consent was voluntary. *See United States v. Thompson*, 842 F.3d 1002, 1009 (7th Cir. 2016) (listing custody as one of many factors to consider when determining whether consent was voluntary).

investigatory detention," though such measures may be "appropriate in certain circumstances." *Matz v. Klotka*, 769 F.3d 517, 524 (7th Cir. 2014); *see also United States v. Bulloch*, 632 F.3d 1004, 1016 (7th Cir. 2011) ("Subtle, and perhaps tenuous, distinctions exist between a *Terry* stop, a *Terry* stop rapidly evolving into an arrest, and a *de facto* arrest.") (quoting *United States v. Tilmon*, 19 F.3d 1221, 1224 (7th Cir. 1994). If Mitchell is to be believed, the stop here bears many of the hallmarks of an outright arrest—something that "should not be functionally indistinguishable" from a *Terry* stop in ordinary circumstances. *Matz*, 769 F.3d at 527.

The Government has not argued that the surveillance team had probable cause to search the vehicle or to arrest the Defendants before the investigatory stop. The evidence does not support the conclusion that the search was justified as a protective sweep, nor that officers could see the brick of heroin in plain view through the window. The only basis for permissible access to Mitchell's vehicle is consent. In light of the Government's shifting narrative and the conflicting testimony of the officers at the scene, the court concludes that the preponderance of the evidence does not support their claim that Mitchell consented. As a result, the court reverses its earlier determination and grants the Defendants' motions to suppress.

## CONCLUSION

For the reasons stated, the Defendants' renewed motions to suppress [85, 87, 91, 92] are granted.

ENTER:

Dated: May 15, 2018

_____
REBECCA R. PALLMEYER
United States District Judge